IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | | |
|---|---|---|
| In re: | ) | |
| | ) | |
| Harold U. Owen, III, | ) | Case No.: 11-03422-BGC-7 |
| | ) | |
| Debtor. | ) | |
| | ) | |

| | | |
|---|---|---|
| Harold U. Owen, III, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | AP No.: 11-00396-BGC |
| | ) | |
| Garrett Auto Sales, LLC, | ) | |
| | ) | |
| Defendant. | ) | |

**Memorandum Opinion
on Count VI of the Plaintiff-Debtor's Second Amended Complaint
and the Defendant's Motion for Relief from and Annul of Stay**

The matters before the Court are Count IV of the Second Amended Complaint filed pursuant to 111 U.S.C. § 362(k)(1) by the plaintiff-debtor, Mr. Harold U. Owen, III, on September 21, 2012 (A.P. Docket No. 24), and the Motion for Relief From and Annul of Stay filed by the defendant, Garrett Auto Sales, LLC. ("GAS") on December 4, 2012 (Case Docket No. 103).

In Count Four, the plaintiff seeks to recover damages pursuant to 11 U.S.C. § 362(k)(1) for an alleged willful violation of the automatic stay.[1] The defendant seeks to obtain relief from the stay, preferably annulment of the stay ab initio, or at least from the time its agents repossessed the automobile involved herein.

---

[1] Counts one through three of the complaint, namely Truth in Lending Act claims and supplemental state law claims are being heard by the U.S. District Court for the Northern District of Alabama. An order withdrawing the reference of those matters was entered by that court on July 7, 2014. See Owen v. Garrett Auto Sales LLC, Case No. 14-00912-MHH, District Court Docket No. 4.

After notice, a trial was held on March 14, 2014.  The plaintiff, Mr. Harold U. Owen, III; his attorney, Mr. A. Wilson Webb; Mr. Solomon Garrett, a principal of the defendant, Garrett Auto Sales, LLC; Mr. James M. Wooten, the defendant's attorney; and Mr. Gene Falls, an employee of Garrett Auto Sales, LLC; were present at the hearing.

The matter was submitted on the testimony of Mr. Owen and Mr. Falls; exhibits admitted into evidence; the records in this adversary proceeding and bankruptcy case No. 11-03422-BGC-7; and arguments of counsel.

## I.  Findings of Fact

The plaintiff, Mr. Harold Owen, purchased a 2001 Ford Mustang automobile from the defendant, Garrett Auto Sales, on December 27, 2010.  The purchase price was $9,883.95.  He paid $3,000 of the purchase price and GAS financed the remainder.

Mr. Owen filed the present case under Chapter 13 of the Bankruptcy Code on July 8, 2011.  He did not claim the Mustang as exempt in his schedule of assets.  Moreover, he did not list GAS in his schedule of secured creditors or on his creditor matrix. Instead, he listed "Car Financial Services, Inc." ("CFSI") of Lake Mary, Florida as the security holder on the Mustang.  He proposed in both the first Chapter 13 plan that he submitted on July 10, 2011, and the amended plan that he submitted on August 7, 2011, to make fixed monthly payments for a period of 60 months to CFSI.

CFSI never filed a proof of claim.  But on September 1, 2011, GAS did. The proof of claim avers, and the documents attached thereto substantiate, that GAS, rather than CFSI, is the holder of the purchase money security interest in the Mustang.  No one disputes that fact. Consequently, in his second amended Chapter 13 plan he filed on September 20, 2011, Mr. Owen proposed to pay the balance owed on the Mustang to GAS, rather than CFSI, in 60 monthly installments of $159 each.  That plan was confirmed by order of this Court dated October 29, 2011.

Mr. Owen converted his case to chapter 7 on June 27, 2012.  A First Meeting of Creditors (Section 341 meeting) was set for July 23, 2012, in the converted case.  Notification of the conversion of the case and the 341 meeting were mailed to GAS.

On July 15, 2012, Mr. Owen filed a document entitled "Certificate of Service."  Case Docket No. 93.  On the first page of that document, he represented that he served copies of the following documents on the trustee and the Bankruptcy Administrator: a "Summary of Schedules and Statistical Summary of Certain Liabilities," an "Attorney's Statement of Compensation," a "Statement of CMI and Form 22A, Means-Test Calculation," and a "Statement of Intention."  The documents were attached to the "Certificate of Service."  He also indicated on the front page of the "Certificate of Service" that he was making no amendments to the schedules he had theretofore filed while the case was proceeding under chapter 13.

In the "Chapter 7 Individual Debtor's Statement of Intention" attached to the "Certificate of Service," Mr. Owen indicated that he intended to retain the Mustang and reaffirm the debt that he owed to GAS. In the section of that form in which he expressed his intention with respect to the Mustang, he marked a block labeled "Not claimed as exempt." Neither the statement of intention nor the "Certificate of Service" indicates that the former, which is mandated by 11 U.S.C. § 521(a)(2)(A), was served on GAS, as required by Rule 1007(b)(2) of the Federal Rules of Bankruptcy Procedure.

According to Mr. Owen, Mr. Wooten, GAS's attorney in this proceeding, appeared at the 341 meeting on July 23, 2012, and questioned him regarding his intentions with respect to the Mustang. Mr. Owen testified that he told Mr. Wooten on that occasion that he intended to retain it and reaffirm the debt to GAS.

After he left the 341 meeting, Mr. Owen drove the Mustang to a hospital for a doctor's appointment. While he was in the doctor's office, repossession agents contracted by GAS took the car. He said that he was shocked and "discombobulated" to find his car missing from the parking lot. He said that he called GAS and asked one of the identical twins who managed the establishment, either Eddie or Edward Reid, if they had repossessed the car and, if so, if he could have it back. He said that the person he talked to, either Eddie or Edward, told him that they had in fact repossessed the car and had no intention of either returning it to him or allowing him to reaffirm the debt to GAS. Two or three days later, Mr. Owen went to GAS to retrieve personal items that were in the car when it was repossessed by GAS. He said that the manager he dealt with on that occasion refused to permit him to look in the Mustang for his personal items but indicated that the items had been placed in a garbage bag and stored in the trunk of another car on the lot. Mr. Owen retrieved the bag with the items from the other car. He did not suggest that anything in the Mustang when it was repossessed was missing or otherwise not in the bag he retrieved from the other car.

Mr. Gene Falls, GAS's account manager, testified that one of his duties was to monitor the cases of customers who were making payments to GAS through the bankruptcy court, including Mr. Owen. In his performance of that duty, he routinely monitored the Chapter 13 trustee's website for the purpose of remaining current on the status of those cases. He said that on July 3, 2012, the information posted on that website reflected that Mr. Owen's chapter 13 case had been closed on June 28, 2012. See GAS Exhibit 7, which was identified by Mr. Falls as a screen shot of the information page relating to Mr. Owen's case that appeared on the Chapter 13 trustee's website on April 10, 2013. That document indeed bears the entry "Close Date: 6/28/2012." Next to that entry, however, the following words appears: "Converted to Another Chapter." Mr. Falls did not print out the entry that he purportedly viewed on July 3, 2012, but later printed the April 2013 entry in anticipation of trial to show as an example of what he had earlier viewed. He testified that while the July 3, 2012, screen shot bore the entry "Close Date: 6/28/2012," it did not contain the words "Converted to Another Chapter." He said that had the July 3, 2012, entry contained those additional words he would not have initiated the process of repossession.

3

Mr. Falls reported to one of the managers of GAS, Eddie Reid that it was his impression that Mr. Owen's bankruptcy case had been closed. He also reported to Mr. Reid that he had concluded, based on his investigation, that the Mustang was uninsured. Based on those two considerations, plus the fact that Mr. Owen was approximately $3,000 in arrears on his payments, Mr. Reid instructed Mr. Falls to arrange for the repossession of the car.

Contrary to Mr. Falls' testimony of GAS's purported ignorance of Mr. Owen's case having been converted to Chapter 7 is the fact of Mr. Wooten's appearance at Mr. Owen's 341 meeting on behalf of GAS and the fact that the record clearly reflects that notice of the 341 meeting to be held in the converted case was mailed to GAS. In support of his position, he vigorously denied that GAS received notice of the 341 meeting, or had any knowledge that the case had been converted rather than closed, or knew that Mr. Wooten would be attending the 341 meeting, until after the Mustang had been repossessed, which is when Mr. Wooten first provided them with that information. That of course is contrary to his responsibility to communicate with attorneys employed by GAS to represent it in bankruptcy cases. He admitted, however, that mail sent to GAS did not come to him first, but was instead routed through the sales office that was run by the Reids. He said that if he had received the 341 notice in the converted case, he would have stopped the repossession in its tracks. Mr. Wooten, who represented GAS at trial, offered no guidance on the subject of his attendance of and participation in the 341 meeting.

Mr. Falls testified that another factor which led GAS to repossess the Mustang, in addition to his impression that Mr. Owen's bankruptcy case had been closed, was his belief that it was not insured against loss. The retail installment purchase contract signed by Mr. Owen explicitly required him to maintain insurance on the vehicle, naming GAS as loss payee to the extent of its security interest, that would pay GAS in the event the vehicle was lost, destroyed, or damaged. It included:

> INSURANCE YOU MUST HAVE ON THE VEHICLE. Property insurance is required. You may obtain such insurance for the vehicle from any insurer you choose authorized to do business in Alabama and through any person you choose. You will provide fire, theft, comprehensive and collision or upset coverage in the amount of the vehicle's actual cash value less a maximum deductible of $500. Each policy insuring the vehicle will be payable to us as our in interests may appear. You will furnish us satisfactory evidence of insurance. Each policy you get will provide that the insurance company will give us at least 10 days' written notice before the policy is canceled. If you fail to obtain or provide proof of the insurance described above, or if you fail to pay any insurance premium, we may, at our option, obtain insurance coverage at your expense for our interest only. Insurance we buy will not cover your equity or your interest in the vehicle. Any coverage we buy will not include insurance on liability for bodily injury or property damage for damage done

4

to property other than the vehicle, and will not meet the requirement for
proof of financial responsibility under Alabama law.  Insurance we buy at
your expense may protect our interest in the vehicle for the outstanding
contract balance.  Any amounts we pay will be added to the amount due
under this contract. The charge for the insurance will be the premium of
the insurance and a finance charge equal to the Annual Percentage Rate
shown in this contract or, at our option, the highest rate the law permits.  If
the vehicle is lost or damaged, at our option, we can use the insurance
proceeds to replace or repair it or to repay any amounts you owe under
this contract.  The charges for insurance we obtain may be substantially
higher than charges you would pay if you bought the insurance you are
required  by this contract to have on the vehicle yourself.  You may obtain
for your own insurance at any time through any insurance company of
your choice, unless we, for good cause, refuse to accept it.  We will
cancel any insurance we may have placed upon receipt of evidence of
your having acceptable insurance in effect.

GAS Exhibit 1.

     Mr. Owen's failure to obtain and maintain the requisite insurance on the vehicle, or his failure to make GAS a loss payee of that insurance to the extent of its interest in the vehicle, or his failure to provide proof of that insurance to GAS, all constituted "defaults" under the contract, which specifies that the failure by Mr. Owen to perform any requirement of the same constitutes a default. The document read, "DEFAULT: Any of the following events will be considered a default: ... your failure to perform or breach of any section of this contract." Id.  Moreover, GAS's right to repossess the vehicle was triggered by any such default which under the document was, "REPOSSESSION: If you are in default, we may take the vehicle from you if we may do so without a breach of the peace."  Id.

     It was Mr. Falls' job to make sure that the cars financed by GAS stayed insured. He said that making sure those cars were insured, and that GAS was named as loss payee on the insurance policies, was essential because on occasion purchasers had in the past wrecked cars financed by GAS and GAS had ended up receiving only the salvage value of those vehicles because they had either been uninsured or GAS had not been named as loss payee on the policies and the insurance company had paid the proceeds to the purchasers instead of GAS.

     Mr. Owen acknowledged his responsibility to maintain insurance on the Mustang, with GAS listed as loss payee with no more than a $500 deductible and the contractual consequences, namely default and repossession, if he failed to do so. However, his stock response to many of the salient questions about insurance on the vehicle was to say he did not know because his wife handled it, as if her doing so might somehow absolve him of those consequences.

5

Case 11-00396-BGC    Doc 102    Filed 09/08/14    Entered 09/08/14 13:26:56    Desc Main
Document      Page 5 of 13

Mr. Owen said that his wife obtained insurance on the vehicle the day he bought it from GAS and indeed GAS's Exhibit 3, a "Verification of Coverage" from GEICO dated December 28, 2010, confirms that representation. However, the document does not reflect that GAS was named as loss payee on the insurance policy and indicates a comprehensive and collision deductible of $1,000. The document reflects that the policy, Policy Number 4193199215, was good through April 17, 2011. Oddly, another almost identical document from GEICO admitted into evidence, GAS Exhibit 9, reflects that Policy Number 4193199215, was good only through January 28, 2011.

Both Mr. Falls and Mr. Owen said that the policy was cancelled by GEICO about a month later. Mr. Owen said that his wife told him that someone at GEICO had told her that GEICO had cancelled the policy because it had discovered that the Mustang had a "salvage title." When asked if he had told GEICO to name GAS as a loss payee on the policy to the extent of its interest, he responded that he had not because his wife had handled it. He admitted that he had not told GEICO to make the comprehensive and collision deductible $500 rather than $1,000, as required by his contract with GAS.

Mr. Owen was asked if the GEICO policy had been in fact cancelled for non-payment of the premium. Instead of confirming his original "salvage title," response, he said that he did not know whether it had been cancelled for failure to pay the premium, and again, his wife had handled it. Moreover, Mr. Owen's statement about the alleged "salvage title" reason, aside from being hearsay within hearsay and unreliable for that reason, is further eroded by Mr. Falls' statements that: GAS sells cars with "salvage titles" all the time; that the persons buying those cars readily find insurance from the companies like State Farm, Progressive, and All State; and that he has never known of an insurance company having cancelled a policy because the car had a "salvage title." Furthermore, Mr. Owen and his attorney admitted and stipulated that the former possesses no document from GEICO which reflects that its cancellation of the insurance resulted from the Mustang having a "salvage title".

More importantly, GAS's Exhibit 4, a compendium of documents obtained from GEICO, which evince the history of Mr. Owen's, and his wife's, policy with GEICO, specifically Policy No. 4193199215, the same policy used by Mr. Owen to finance the Mustang, refutes his claim that GEICO cancelled the policy on the Mustang because of its "salvage title." Those documents reflect unequivocally that Policy No. 4193199215 was cancelled by GEICO on January 28, 2011, one month after Mrs. Owen obtained it, and one month after Mr. Owen had purchased and financed the Mustang, because of a failure to pay the premium. The documents also reflect that the premium is still owed by the Owens. But when asked if he still owes GEICO for the premium, Mr. Owen predictably answered that he did not know because his wife handled the insurance. He admitted, however, that he did not inform GAS that the GEICO policy had been cancelled.

GAS's Exhibit 5 reflects that Mr. Owen or his wife obtained insurance on the Mustang on February 23, 2012, and that that insurance was in effect when the Mustang

6

was repossessed. Whether, and to what extent, Mr. Owen had insurance on the Mustang at any time between January 28, 2011, and February 23, 2012, is an open question that is not answered by the evidence. GAS's attorney, for whatever reason, attempted to establish that Mr. Owen obtained insurance on the vehicle through "Esurance," but it is apparent from Mr. Owen's testimony that he did not, and he did not know whether his wife had. Moreover, the "Policy Declaration Page" from Esurance dated January 28, 2011, on which the Mustang is listed, GAS's Exhibit 9 relied on by counsel, enigmatically indicates that the coverage reflected therein expired that same date at "12:01 AM."

The Progressive policy obtained by Mr. or Mrs. Owen on the Mustang on February 23, 2012, had a comprehensive and collision deductible of $500, as required by his contract with GAS. However, there is nothing in the evidence which indicates that GAS was named as a loss payee in the policy. Furthermore, there is no evidence that Mr. Owen either informed GAS that he had obtained the insurance or provided proof of that insurance to GAS. Certainly, he gave no testimony to that effect. Mr. Fall testified that he called Mr. Owen's Chapter 13 attorney sometime, it appears, after February 2012, and asked his secretary whether or not Mr. Owen had insurance on the Mustang. He testified that she told him that he had "Progressive." But she did not provide him a copy of the policy or give him a policy number or any additional information. Mr. Falls in turn called Progressive in an attempt to confirm that Mr. Owen's had the requisite insurance on the Mustang but was unsuccessful.

Mr. Falls testified that two or three days after the Mustang was repossessed, GAS offered to return it to Mr. Owen. Mr. Owen denied that GAS offered to return the car to him until after the matter was mediated, which was in the summer of 2013.

In support of his normal practices, Mr. Falls testified that GAS has unwittingly attempted to repossess two cars from debtors in bankruptcy other than Mr. Owen. On each occasion, the debtor was present and told the repossession agent that he or she was in Chapter 13. The agent in turn reported that fact to Mr. Falls. Mr. Falls then called the debtor's attorney on the spot to verify the bankruptcy. Upon receipt of that verification, Mr. Falls called the agent back and directed him to discontinue the repossession.

Mr. Owen testified that after the Mustang was repossessed, his wife, on most days, would have to take him to work at 5:30-6:00 am. The problem was that she worked also and did not have to be at work until 9:00 am in a different part of the city. So she would have to get up much earlier than she otherwise would have to take him to work, and then wait until her workday began. Other days he caught rides with friends or co-workers. Sometimes he had to pay gas money to the person giving him a ride. Another problem was that none of his co-workers lived near him, so they had to go out of their way to pick him up. Or his wife would have to take him to meet them at a particular spot, which would again require her to get up much earlier than she would otherwise. Mr. Owen's obtained a replacement vehicle in the middle of October, 2012.

7

## II. Conclusions of Law

### A. Mr. Owen has no standing to pursue a 362(k)(1) cause of action

#### 1. General Rules

The law of standing is succinctly stated as follows:

Article III of the Constitution limits the federal courts to deciding "cases" and "controversies." U.S. Const. art. III, § 1. The Supreme Court has long recognized that this limitation means that the federal courts cannot exercise jurisdiction over cases where the parties lack standing, or where the issue in controversy has become moot. See <u>Summers v. Earth Island Inst.</u>, 555 U.S. 488, 129 S.Ct. 1142, 1148–49, 173 L.Ed.2d 1 (2009).

> A federal court has the obligation to review <u>sua sponte</u> whether it has subject matter jurisdiction under Article III's case-or-controversy requirement. <u>Nat'l Parks Conservation Ass'n v. Norton</u>, 324 F.3d 1229, 1242 (11th Cir.2003) (citing <u>Juidice v. Vail</u>, 430 U.S. 327, 331, 97 S.Ct. 1211, 1215, 51 L.Ed.2d 376 (1977)). In order to establish that it has constitutional standing to bring a suit:
>
>> a plaintiff must show (1) it has suffered an "injury in fact" that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.
>
> <u>Friends of the Earth, Inc. v. Laidlaw Envt'l. Servs. (TOC), Inc.</u>, 528 U.S. 167, 180–181, 120 S.Ct. 693, 704, 145 L.Ed.2d 610 (2000)(citing <u>Lujan v. Defenders of Wildlife</u>, 504 U.S. 555, 560–561, 112 S.Ct. 2130, 2136, 119 L.Ed.2d 351 (1992)). If at any point in the litigation the plaintiff ceases to meet all three requirements for constitutional standing, the case no longer presents a live case or controversy, and the federal court must dismiss the case for lack of subject matter jurisdiction. See <u>CAMP Legal Def. Fund, Inc. v. City of Atlanta</u>, 451 F.3d 1257, 1277 (11th Cir.2006); <u>De La Teja v. United States</u>, 321 F.3d 1357, 1362 (11th Cir.2003).

<u>Florida Wildlife Federation, Inc. v. South Florida Water Management Dist.</u>, 647 F.3d 1296, 1302 11th Cir. ,2011).

Applying these general rules here, as a Chapter 7 debtor, Mr. Owen, does not have standing to pursue a section 362(k)(1) cause of action against GAS for its alleged violation of the automatic stay because he did not possess any property interest in the Mustang. Section 541(a)(1) of the Bankruptcy Code provides, "The commencement of a case under section 301, 302, or 303 of this title creates an estate... [which is] comprised of ... all legal or equitable interests of the debtor in property as of the commencement of the case." 11 U.S.C. § 541(a)(1) (parenthetical added). Hence, when a debtor files a Chapter 7 petition, that property is transformed into estate property subject to the sole control and dominion of the bankruptcy trustee. In fact, a Chapter 7 debtor is specifically required by 11 U.S.C. § 521(a)(4) to "surrender to the trustee all property of the estate...." Furthermore, it is the trustee, and not the debtor, who possesses the right in Chapter 7 to "use, sell, or lease ... property of the estate." 11 U.S.C. § 363(b)(1). Moreover, it is the trustee's right and obligation, and not that of the debtor, to, "collect and reduce to money the property of the estate ...." 11 U.S.C. § 704(a)(1). And, with respect to that property of the estate, the Chapter 7 trustee, and not the debtor, is the estate's sole representative, and the only person with the authority to sue in that capacity. 11 U.S.C. §§ 323(a)&(b).

### a. Exceptions to the General Rules

There are two exceptions to the above general rules where property of the estate, (which had been property of the debtor before a Chapter 7 filing), may cease being property of the estate and once again become property of the debtor. Those are: (1) the debtor must claim it as exempt pursuant to 11 U.S.C. §§ 522(b)(1)&(l); or (2) the trustee must abandon it pursuant to 11 U.S.C. § 554. As discussed below, neither apply here.

### (1) Claims of Exemption

A Chapter 7 debtor claims property as exempt by listing it, "on the schedule of assets required to be filed by [Bankruptcy] Rule 1007(b)(1)(A)." Fed. R. Bankr. P. 4003(a) (parenthetical added). "The debtor shall file a list of property that the debtor claims as exempt under subsection (b) of this section." 11 U.S.C. § 522(l). Official Form 6C, entitled "Property Claimed as Exempt," is the form designated for listing exempt property. Parties in interest have 30 days from the conclusion of the 341 meeting to object to the debtor's claimed exemptions. Fed. R. Bankr. P. 4003(b)(1). "Unless a party in interest objects, the property claimed as exempt on such list is exempt." 11 U.S.C. 522(l). Once it becomes exempt, the property is no longer property of the estate, and falls outside the exclusive dominion and control of the trustee. "The plain language of the bankruptcy code and precedent from this court are clear that exempt property is no longer part of the bankruptcy estate, and is available for the debtor's use." Gamble v. Brown (In re Gamble), 168 F.3d 442, 444 (11th Cir. 1999).

9

## (2) Abandonment

Abandonment of property of the estate by the Chapter 7 trustee is achieved in one of three ways. The trustee may actively abandon property of the estate on his own volition after notice and a hearing. 11 U.S.C. § 554(a). The Court may order the trustee to abandon property of the estate on request of a party in interest. 11 U.S.C. § 554(b). Or property scheduled by the debtor, which becomes property of the estate when the petition is filed, will be deemed abandoned by operation of law if not administered by the trustee before the case is closed. 11 U.S.C. § 554(c).

### b. These Exceptions Do Not Apply Here

In regard to exempt property, Mr. Owen did not claim the Mustang exempt in the schedule of assets or Official Form 6C that he filed with his Chapter 13 petition on July 8, 2011. Case Docket No. 1. On the front page of the document entitled "Certificate of Service" which he filed on July 15, 2012, after converting his case to Chapter 7, Mr. Owen represented that his original schedules "A through F" were not being amended. Case Docket No. 93. In the "Chapter 7 Individual Debtor's Statement of Intentions" which he also included in that omnibus "Certificate of Service," Mr. Owen checked the box "not claimed as exempt" in the area where he chose to designated his intentions with respect to the Mustang. And on the amended Schedule C that he filed in the converted case on August 10, 2012, he again did not claim the Mustang as exempt. Case Docket No. 95. It is, therefore, without question that Mr. Owen did not claim the Mustang as exempt and never intended to do so. Therefore this exception does not apply.

In regard to abandonment of the Mustang, the Chapter 7 trustee indicated in his "Chapter 7 Trustee's Report of No Distribution," which was entered on the bankruptcy case docket on July 23, 2012, as a no asset final report that he did not intend to administer any property of the estate, including the Mustang, and in fact meant to abandon that property. Technically, that action does not effectuate an abandonment because it does not comply with Rule 6007(a) of the Federal Rules Bankruptcy Procedure. That rule requires the trustee to give notice of a proposed abandonment to all creditors, and for creditors to be given 14 days after that notice to file objections to the proposed abandonment. Therefore the report is insufficient to accomplish abandonment of estate property, which can be effectuated solely in the manner specified in section 554.[2] Consequently, the Mustang has not been abandoned.

---

[2] The Chapter 7 trustee is <u>not</u> at fault. The form report he used is one approved by the Court, and is one which has been used by all Chapter 7 trustees in this division for years. This issue is technical and unusual and does not arise often. This Court's only similar consideration of it was 17 years ago in <u>In re Beaton</u>, 211 B.R. 755 (Bankr. N.D. Ala.1997). In <u>Beaton</u> the Chapter 7 trustee sought to withdraw a "final report" that ostensibly abandoned the estate's interest in property which a creditor then wanted to purchase. In <u>Benton</u>:

10

Therefore, this exception does not apply.³

Therefore, because the Mustang was neither claimed exempt by Mr. Owen or abandoned, at this time, it remains "property of the estate" rather than "property of the debtor."

---

> The debtors contend that the filing by the trustee of his no-asset final report, in which he states that he "deem[s] abandoned any and all property of the estate that is unadministered as of the date of this report," constituted an irrevocable abandonment by the trustee of the real property scheduled by the debtors and that the property is, therefore, no longer part of the bankruptcy estate and cannot now be sold or otherwise administered by the trustee. The trustee contends that the filing by him of a no-asset final report does not, by itself, result in an abandonment of estate property. The trustee contends that abandonment may be accomplished only pursuant to 11 U.S.C. § 554 after notice to all creditors and a hearing or upon the closing of the bankruptcy estate.

Id. at 757. In ruling for the trustee. this Court discussed in detail what constitutes abandonment and when it is effective. In regard to section 544, the Court explained:

> Based on the language of the statute, this Court finds that the meaning of the statute is plain. Scheduled property may be abandoned by the trustee after notice to all creditors and a hearing; or, scheduled property, which is not administered by the trustee, is abandoned by operation of law upon the formal closing of the bankruptcy case. The statute does not mention a trustee's final report or otherwise authorize a trustee to abandon property solely by filing any document with the bankruptcy court which is not accompanied by notice and a hearing. These notice and hearing requirements serve to protect the trustee, who often must make decisions based on incomplete or less than candid information supplied by debtors, but they serve to protect creditors from improvident, ill-advised or hasty decisions by bankruptcy trustees. These benefits would be eviscerated if a trustee is allowed to abandon property by simply filing a statement with the bankruptcy court of his intent to do so. From a statutory perspective, this Court finds that the trustee did not abandon the property subject to this proceeding.

Id. at 758 (four explanatory footnotes omitted).

³ Although the Chapter 7 trustee has not filed notice to abandon the Mustang pursuant to section 554(a), nor given notice of any such proposed abandonment to all creditors as is required by Rule 6007(a), nor has any party in interest requested that the trustee be directed to abandon the Mustang, the case remains open thus allowing the trustee time to abandon the property pursuant to operation of section 554(c) if he chooses. Abandonment now would not, however, resurrect, the debtor's standing. The instant order not only dismisses Count IV of Mr. Owen's Second Amended Complaint (A.P. Docket No. 24), it grants Garrett Auto Sales, LLC's Motion for Relief From and Annul of Stay (Case Docket No. 103) to the extent that its motion seeks immediate, present, and prospective relief from the automatic stay.

11

## 2. Conclusion to Standing

With respect to "property of the estate," Subsections 362(a)(3) and (4) provide that a petition filed pursuant to Chapter 7 operates as a stay of, "any act to obtain possession of property of the estate or of property from the estate or to exercise control over property of the estate;" and "any act to create, perfect, or enforce any lien against property of the estate." 11 U.S.C. §§ 362(a)(3)&(4). With respect to "property of the debtor," Section 362(a)(5) provides that a petition filed under Chapter 7 operates as a stay of, "any act to create, perfect, or enforce against property of the debtor any lien to the extent that such lien secures a claim that arose before the commencement of the case under this title." 11 U.S.C. §362(a)(5).

Mr. Owen did not indicate in his complaint which subsection of 362 was purportedly violated by GAS. However, since the Mustang has at no point in time been "property of the debtor," GAS could not possibly have violated section 362(a)(5).

Mr. Owen was deprived of any interest he had in the Mustang by virtue of section 541(a)(1) when he converted his case to Chapter 7 because it then became "property of the estate." At that point, Mr. Owen became duty bound by section 521(a)(4) to relinquish the Mustang to the trustee, and the trustee became authorized by section 704(a)(1) to collect the Mustang from him. Moreover, because the Mustang is "property of the estate," the trustee is, by virtue of section 363(b)(1), the only entity with the right to use, sell, or lease it. And since the trustee was the only entity with any interest in the Mustang when GAS repossessed it, he was the only entity who could have possibly suffered any injury or damages as a result of GAS's purported violation of either section 362(a)(3) or section 362(a)(4).

On the other hand, Mr. Owen could not possibly have suffered any injury or damages as a result of the Mustang's repossession because he had no interest in it, and, a fortiori, no right to use it, when it was repossessed. Therefore, Mr. Owen lacks standing to pursue the present action. Wells Fargo Bank v. Jimenez, 406 B.R. 935, 945 (D.N.M. 2008); Cook v. Wells Fargo Bank (In re Cook), 2012 WL 1356490, *9 (10th Cir. BAP, April 19, 2012); Marquez v. ADP, Inc. (In re Marquez), 2013 WL 74606, *4 (Bankr. D.N.M., Jan. 4, 2013); In re Ryan Yuho Chong, 2013 WL 1829662, *8 (Bankr. E.D. Va., May 1, 2013); In re Sang Yul Lee, 2011 WL 5452830, *2 (Bankr. D. Alaska, March 15, 2011); In re Kessler, 2011 WL 1042617, *2 (Bankr. S.D. Cal., March 4, 2011); Bucchino v. Wells Fargo Bank (In re Bucchino), 439 B.R. 761, 772-773 (Bankr. D.N.M. 2010); In re Young, 439 B.R. 211, 217-218 (Bankr. M.D. Fla. 2010); Copley v. West Virginia Tax Dept. (In re Copley), 2008 WL 2795139, *4 (Bankr. S.D.W.Va. June 27, 2008); Calvin v. Wells Fargo Bank (In re Calvin), 329 B.R. 589, 601-602 (Bankr. S.D. Tex. 2005); In re Laux, 181 B.R. 60, 61 (Bankr. S.D. Ill. 1995).

In addition, at the moment of conversion the trustee became the only entity by law which could represent the estate with respect to the Mustang, or who could sue or be sued with respect to the same. 11 U.S.C. §§ 323(a)&(b). Therefore, for that reason

as well Mr. Owen lacks the standing to represent the estate in an action, which the present action purports to be, that is for injury to estate property or injury resulting to the bankruptcy estate from the wrongful exercise of dominion over that estate property, or to otherwise sue for injury to property of the estate, or injury resulting to the bankruptcy estate from the wrongful exercise of dominion over estate property.

### B. GAS's Motion for Relief From the Stay

GAS's motion for relief from the stay is due to be granted. The motion was served on the Chapter 7 trustee, and he was provided notice of the hearing on the motion. Despite that, he has offered no opposition to it and expressed no interest in the Mustang. To the contrary, he indicated in his "Chapter 7 Trustee's Report of No Distribution" which was entered on the bankruptcy case docket on July 23, 2012, that he has no desire to pursue either it or any other "property of the estate." Those facts constitute ample cause for granting GAS relief from the stay. But since the purpose of seeking annulment of the stay was to prime Mr. Owen's section 362(k)(1) action, and Mr. Owen's action will be dismissed, annulment does not appear to be warranted at this point in time.

### III. Conclusion and Order

For the reasons discussed and expounded herein, Count IV of Mr. Owen's Second Amended Complaint (A.P. Doc. No. 24) is due to be dismissed for lack of subject matter jurisdiction and the Motion for Relief From and Annul of Stay (Bk Doc. No. 103) filed by Garrett Auto Sales, LLC, is due to be granted to the extent it seeks immediate, present, and prospective relief from the automatic stay. A separate order will be entered in accordance with this memorandum opinion.


Dated: September 8, 2014      /s/Benjamin Cohen
                              BENJAMIN COHEN
                              United States Bankruptcy Judge

BC:sm